IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNICREDIT BANK AG, NEW YORK
BRANCH, f/k/a BAYERISCHE HYPO-
UND VEREINSBANK AG, as agent for
THE BANK OF NEW YORK MELLON,

      Plaintiff/Counterclaim Defendant,

      vs.                        Case No. 13-2311-SAC

RKC FINANCIAL CORPORATION, et al.,

      Defendants/Counterclaim Plaintiffs,

      vs.

THE BANK OF NEW YORK MELLON,

      Counterclaim Defendant.

MEMORANDUM AND ORDER

      The plaintiff, UniCredit Bank AG, New York Branch ("UniCredit"),

brings this action as the agent of The Bank of New York Mellon ("BONY") to

recover on a defaulted securitized loan against RKC Financial Corporation

("RKC") and the guarantors of that loan, Roger and Mary Cunningham

(collectively "defendants or counterclaim plaintiffs"). The case comes before

the court on the following pending motions:  the defendants' motion to

dismiss (Dk. 18), the plaintiff's motion to dismiss amended counterclaims

and to strike affirmative defenses (Dk. 26), the counterclaim defendant

BONY's motion to dismiss counterclaims (Dk. 45); and the plaintiff's motion

to dismiss the second amended counterclaims and to strike affirmative

defenses (Dk. 47). For the reasons stated below, the court grants in part and denies in part the defendants' motion and grants the plaintiff's and BONY's motion subject to consideration of a timely motion by the defendants for leave seeking to file an amended pleading.

**FACTUAL BACKGROUND**

This case is the fourth in a group of related actions filed by UniCredit to recover on defaulted promissory notes held, pooled, sold and securitized by various corporate and business entities flying the Brooke[1] flag. As an aid in understanding the court's factual background, here is a useful summary of the securitization process taken from a recent decision by Chief Judge Marten:

> A securitization involves two steps, which may occur simultaneously or separately. Initially, an entity that creates loans in its normal course of business (the "Originator") sells its loans to a special purpose entity ("SPE"). The sale will be performed in a manner that qualifies as a "true sale," as opposed to a secured transaction, which is done in part to protect the loans and their streams of revenue from creditors of the Originator. Second, the SPE will issue and sell debt securities, referred to as Notes, to investors. The Notes are secured by the loans the SPE bought from the Originator. Additionally, the SPE will satisfy its obligations on the Notes using the proceeds of the loans it bought from the Originator. When the securitization is "closed," funds flow from the purchasers of the Notes (the investors) to the SPE, and then from the SPE to the Originator.

*UniCredit Bank AG, New York Branch v. Deborah R. Eastman, Inc.*, 2013 WL 237810 at *1 (D. Kan. 2013). Now, it is just a matter of putting names,

---

[1] Brooke Corporation, through various and related subsidiaries and companies, operated an insurance agency franchise business and offered the financing to businesses and individuals purchasing these agencies.

dates, documents and details to this process after first describing the original loan that was pooled and sold.

Defendants' Loan Documents

On June 29, 2005, the defendant RKC signed a promissory note designated as "loan number 4683" in the amount of $2,700,000.00 for the stated purpose, "[t]o acquire insurance agency assets and purchase buyer's assistance plan." (Dk. 1-6, pp. 1-2). The lender was Brooke Credit Corporation ("BCC"). *Id.* In support of the note, the parties executed an "Agreement for Advancement of Loan" which set forth the terms and conditions of their contractual relationship involving the loan. (Dk. 1-5). They also executed a commercial security agreement which gave BCC a security interest in RKC's personal property and agency assets. (Dk. 1-7). Also on June 29, the defendant Cunninghams executed a guaranty to secure the RKC loan. (Dk. 1-9). This loan was made in the State of Kansas.

Securitization of Defendants' Loan

As the originator of the loan, BCC funded it from a line of credit issued by a bank under a warehouse arrangement whereby BCC also gave some interest in the loan to the bank and some interest also to Brooke Credit Funding, LLC. Over time, more loans of a similar nature were made and then pooled in the warehouse. (Dk. 1, ¶ 16). BCC and related Brooke entities sponsored securitizations by creating special purpose limited liability securitization companies which were sold the pooled warehouse loans in

3

exchange for cash raised by the securitization companies from the issuing of notes to investors. BCC would sell these loans to the securitization companies under a Sale and Servicing Agreement.

Pursuant to the Sales and Servicing Agreement dated December 1, 2005, BCC sold all of its "right, title and interest in and to the Loans and the Other Conveyed Property relating thereto" to the SPE, Brooke Securitization Company V ("Brooke Securitization" or "Issuer") (Dk. 1-1, p. 19). This Agreement spelled out the transfer in these terms:

> [T]he Seller shall sell, transfer, assign, grant, set over and otherwise convey to the Issuer, without recourse (subject to the obligations herein), all right, title and interest of the Seller in and to:  (i) the Loans, all monies due thereunder after the Cutoff Date and all Liquidation Proceeds and recoveries received with respect to such Loans; (ii) the security interests in the collateral (including the Agency's Assets, Customer Files and Sales Commissions, if any, securing the Loans; (iii) any proceeds from claims on any repossession loss, physical damage, credit life and credit accident and health insurance policies covering such collateral, if any, or the Obligors; (iv) the Loan File (including the Loan Documents) related to each Loan; (v) the Trust Accounts and all funds on deposit in the Trust Accounts from time to time, and all investments and proceeds thereof (including all income therein) (although the parties hereto acknowledge that the Seller has no interest in the items described in this clause (v)); and (vi) the proceeds of any and all of the foregoing.

(Dk. 1-1, p. 19). RKC's loan promissory note, No. 4683, was in this pool of loans sold to Brooke Securitization on December 1, 2005. (Dk. 1-1, p. 61).

For these loans Brooke Securitization paid cash raised by issuing a series of Notes ("2005-2 Notes") pursuant to an indenture dated December 1, 2005, between itself, as the issuer, and BONY as indenture trustee. The

Indenture spelled out that the Issuer granted a first priority perfected

security interest to the Trustee in the following "Indenture Asset Pool:"

> All of the Issuer's right, title and interest in and to: (a) the Loans, all
> monies received thereunder after the Cutoff Date and all Liquidation
> Proceeds and recoveries received with respect to such Loans; (b) the
> security interest in the collateral (including the Agency's Assets,
> Customer Files and Sales Commissions), if any securing the Loans; (c)
> any proceeds from claims on any repossession loss, physical damage,
> credit life and credit accident and health insurance policies, if any,
> covering such collateral or the Obligors; (d) the Loan File (including
> the Loan Documents) related to each Loan; (e) the Trust Accounts and
> all funds on deposit from time to time in the Trust Accounts and in all
> investments and Proceeds thereof (including all income thereon); (f)
> the Sale and Servicing Agreement, including the right to cause the
> Seller to repurchase Loans from the Issuer under certain
> circumstances, the Master Agent Security Agreement and the other
> Related Documents; and (g) all present and future claims, demands,
> causes and choses in action in respect of any or all of the foregoing
> and all payments on or under and all proceeds of every kind and
> nature whatsoever in respect of any or in lieu of the foregoing, . . . .

(Dk. 1-2, p. 5). RKC's loan No. 4683 was among the loans identified in the

Indenture Asset Pool. (Dk. 1-3, p. 31).  Thus, the Issuer, Brooke

Securitization, owned RKC's loan No. 4683, pledged it and all of the Issuer's

assets to secure its obligation under the Indenture to pay the 2005-2 Notes,

and granted the Indenture Trustee, BONY, a security interest in RKC's loan

and all other loan assets for the benefit of the holders of 2005-2 Notes.

UniCredit purchased 58.25% of the 2005-2 Notes.

BONY, as the Indenture Trustee, is the secured party in relation

to Brooke Securitization and obtained a security interest in the security

interests that secure RKC's loan. As the complaint alleges, the Indenture

authorizes BONY as trustee to "(i) collect the funds generated by the

5

collateral (i.e. the loans in the Asset Pool) under the indenture; (ii) liquidate the collateral following an event of default under the Indenture, the proceeds of which are to be held in trust for holder of the Notes; and (iii) take measures to protect the collateral under the indenture." (Dk. 1, ¶ 33). These terms became operative upon the default events set out below.

This Sales and Servicing Agreement also designated Textron Business Services, Inc. ("Textron") to act as "Servicer" for the Issuer Brooke Securitization. It provides, in relevant part:

> The Servicer is hereby authorized to act as agent for the Issuer and in such capacity shall manage, service, administer and make collections on the Loans, and perform the other actions required by the Servicer under this Agreement. . . . The Servicer is hereby authorized to commence, in its own name or in the name of the Issuer (provided the Servicer has obtained the Issuer's consent, which consent shall not be unreasonably withheld), a legal proceeding to enforce a Loan pursuant to <u>Section 3.3</u> or to commence or participate in any other legal proceeding (including a bankruptcy proceeding) relating to or involving a Loan, an Obligor or the collateral, if any, securing the Loan. If the Servicer commences or participates in such a legal proceeding in its own name, the Issuer shall thereupon be deemed to have automatically assigned such Loan to the Servicer solely for purposes of commencing or participating in any such proceeding as a party or claimant, and the Servicer is authorized and empowered by the Issue to execute and delver in the Servicer's name any notices, demands, claim, complaints, responses, affidavits or other documents or instruments in connection with any such proceeding.

(Dk. 1-1, p. 29, § 3.1). With execution of the Sales and Servicing Agreement, Textron then entered into a subservicing agreement with BCC whereby BCC would service the loans for Textron performing only those obligations specifically described and set forth on the schedule of services attached to the subservicing agreement. (Dk. 27-4, pp. 1, 9).

Arbitration Proceedings

On March 7, 2007, RKC and Roger Cunningham filed a petition in Tarrant County District Court of Texas against Brooke Corporation, d/b/a First Brooke Corporation, Brooke Credit Corporation, Brooke Franchise Corporation, Brooke Agency Services, L.L.C. and others alleging various claims regarding the loan and the related franchise agreement ("Tarrant suit"). (Dk. 27-1). This suit was abated and stayed on the parties' agreed order on September 25, 2007, to arbitrate the claims before the American Arbitration Association ("AAA"). (Dk. 27-2).  On October 15, 2008, the Arbitrator conducted a telephonic hearing to discuss the final hearing scheduled for October 20, 2008. Jeff Nourse appeared for all party respondents and "announced that because of financial shortcomings within some or all of the Respondents, none of the Respondents would appear at the hearing, neither he nor anyone else would be making an appearance for any Respondent, and all Respondents would be defaulting." (Dk. 27-3). The parties stipulated to the same with Mr. Nourse also stating that he "anticipated that one or more of the Respondents would be seeking debtor relief under the U.S. Bankruptcy laws prior to the time of the hearing." *Id.* Based on the parties' stipulation of default and on the claimants' presentation of "evidence proving liability, causation and damages," the Arbitrator entered on October 21, 2008, a final award finding for the claimants on their claims of fraud, fraud in the inducement, conspiracy,

7

breach of contract[2], civil RICO, conversion, and violations of the Texas

Deceptive Trade Practices Act, and finding actual damages of $3,350,000;

consequential damages of $500,000; exemplary damages of $3,350,000;

and attorneys' fees of $187,500. (Dk. 34-1). Before this arbitration award

could be confirmed, the Brooke Corporation filed for Chapter 11 bankruptcy

on October 28, 2008. In May of 2010, RKC moved for relief from the

automatic bankruptcy stay in order to confirm its arbitration award, and

BONY as indenture trustee opposed that motion.

<u>Defaults</u>

 The plaintiff's complaint alleges that RKC has breached the loan

documents by not making the required loan payments, and the loan is in

default. (Dk. 1, ¶¶ 43-51). Because of this breach, the plaintiff is also

seeking payment from the guarantors, Roger and Mary Cunningham, who

guaranteed this loan. The plaintiff alleges the Cunninghams have refused to

make the payments required by the guaranty. (Dk. 1, ¶¶ 60-62).

 The Complaint further alleges that the Issuer Brooke

Securitization defaulted on its obligations under the Notes. (Dk. 1, ¶¶ 37-

42). UniCredit notified the Trustee BONY on October 9, 2008, that the Issuer

had defaulted on the Notes, and it requested BONY to exercise the

acceleration clause and demand the remainder of the payments due and to

---

[2] Specifically, the Arbitrator found "that Respondents materially breached the Agreement for Sale of Agency Assets, Franchise Agreement, Buyers Assistance Plan, and Agreement for Advancement of Loan" by engaging in conduct outlined from (a) through (k). (Dk. 34-1, p. 4-5).

pursue all available remedies against the collateral. *Id.* at ¶ 38. On October 22, 2008, UniCredit and BONY executed a letter agreement and power of attorney making UniCredit the Trustee's agent "with full power of substitution to take all actions with respect to the rights and remedies permitted under the Indenture, including the right to pursue collection on any collateral securing the Notes." *Id.* at ¶ 36.

<u>BONY's Federal Action Against Brooke Entities</u>

On September 11, 2008, BONY filed a complaint in the United States District Court for the District of Kansas against various Brooke entities alleging fraud and "misappropriation of millions of dollars pledged to noteholders under certain securitizations." *The Bank of New York Mellon v. Aleritas Capital Corporation, et al.* No. 08-2424-JWL (Dk. 1, ¶ 1). Alleging that the Brooke entities were "in a rapidly deteriorating financial state" and were "facing a revolt by hundreds of their franchisees," BONY requested the appointment of a receiver. *Id.* at ¶ 3. BONY filed an emergency motion for receiver and the defendant Brooke entities countered with a motion to appoint a special master. On September 17, 2008, the district court entered a consent order appointing Albert Riederer as Special Master. (Dk. 27-6). The counterclaim plaintiffs in the instant action allege the Special Master "controlled the defense of the Tarrant County Case filed by RKC and the related arbitration." (Dk. 34, ¶ 38). The consent order also provided that the Special Master could not interfere with "[t]he exercise of duties, rights and

remedies by the Noteholders and the Bank of New York Mellon as Indenture Trustee in respect of the Indenture for each Securitization Company." (Dk. 27-6, ¶ 4).

<u>Brooke Bankruptcy</u>

As mentioned above, certain Brooke entitles filed for Chapter 11 relief in the United States Bankruptcy Court for the District of Kansas on October 28, 2008. "On September 20, 2012, the bankruptcy court entered an Order permitting BONY and UniCredit, among others, to pursue the collateral of the securities without any further relief required from the bankruptcy court." *UniCredit Bank AG v. Jue-Thompson*, 2013 WL 6185750 at *3 (D. Kan. Nov. 26, 2013).

<u>Present Action</u>

According to the complaint, the plaintiff demanded the defendants' collateral in June 2013, and their refusal resulted in this action being filed on June 25, 2013. (Dk. 1, ¶¶ 63-64, 143). As the Trustee's acting agent, UniCredit alleges through the above chain of transactions it has acquired the right to enforce the RKC loan documents including the right to pursue the collateral for the collection of the same.  UniCredit alleges the following causes of action: (1) Action on the Loan against RKC Agency; (2) Action on the Guaranty against Roger Cunningham and Mary Cunningham; (3) Detinue and Collateral Foreclosure Judgment against RKC Agency; (4) Quantum Meruit against all Defendants; (5) Breach of Implied Covenant of

Good Faith and Fair Dealing against all Defendants; (6) Conversion against all Defendants; and (7) Account Notice/Declaratory Relief against all Defendants. (Dk. 1, ¶¶ 72-159).

As presently alleged in their Second Amended Answer and Counterclaim, the defendants are pursuing counterclaims against UniCredit and BONY. (Dk. 34, pp. 29-45). The counterclaim plaintiffs are seeking a declaratory judgment that UniCredit and BONY are liable vicariously for the causes of action and damages contained in the Arbitration Award. (Dk. 34, p. 44). As theories for this liability, the counterclaim plaintiffs allege agency, partnership, joint venture and successor liability between the counterclaim defendants and the named parties in the Tarrant suit. The counterclaims section further asserts that UniCredit and BONY were in privity or had the same interests with the parties in the Tarrant suit as to justify res judicata or collateral estoppel bars. Finally, the counterclaims assert the Brooke Entities are alter egos of the BONY and Unicredit.

**STANDARDS GOVERNING MOTIONS**

<u>Dismiss for Lack of Standing/Subject Matter Jurisdiction</u>

A prong of Article III jurisdiction is that a plaintiff has standing to sue. *Hill v. Vanderbilt Capital Advisors, LLC*, 702 F.3d 1220, 1224 (10th Cir. 2012). "To have Article III standing, Petitioners must demonstrate:  '(i) an injury in fact that is both concrete and particularized as well as actual or imminent;  (ii) an injury that is traceable to the conduct complained of;  and

(iii) an injury that is redressable by a decision of the court.'" *Wyoming v.*

*U.S. Dept. of Interior*, 674 F.3d 1220, 1230 (10th Cir. 2012) (quoting

*Wyoming ex rel. Crank v. United States*, 539 F.3d 1236, 1241 (10th Cir.

2008) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112

S.Ct. 2130, 119 L.Ed.2d 351 (1992))).

   Rule 12(b)(1) of the Federal Rules of Civil Procedure authorizes a

district court to dismiss a complaint for lack of subject matter jurisdiction.

Rule 12(b)(1) attacks on subject matter jurisdiction are typically either facial

attacks on the sufficiency of jurisdictional allegations or factual attacks on

the accuracy of those allegations. *Holt v. United States*, 46 F.3d 1000,

1002–03 (10th Cir. 1995). A facial attack questions the sufficiency of the

allegations in the complaint as they relate to subject matter jurisdiction. *See*

*Holt*, 46 F.3d at 1002. In reviewing a facial attack on the complaint, the

court must accept all allegations in the complaint as true. *Id.* If the moving

party factually challenges the subject matter allegations, then it falls to the

district court to make findings of fact after allowing "affidavits, other

documents, and a limited evidentiary hearing." *Id.* at 1003. The court may

decide these matters without converting to a Rule 56 proceeding, unless

"resolution of the jurisdictional question is intertwined with the merits of the

case" and requires the conversion to a Rule 12(b)(6) motion or a Rule 56

motion. *Id*. The defendants here lodge a facial attack to the sufficiency of

the jurisdictional allegations. A court lacking subject matter jurisdiction must

dismiss the cause at any stage of the proceeding in which it becomes apparent that jurisdiction is lacking. *Laughlin v. Kmart Corp.*, 50 F.3d 871, 873 (10th Cir.), *cert. denied*, 516 U.S. 863 (1995).

<u>Dismiss for Failure to State a Claim</u>

In deciding a Rule 12(b)(6) motion, a court accepts as true "all well-pleaded factual allegations in a complaint and view[s] these allegations in the light most favorable to the plaintiff." *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir.2009), *cert. denied*, 130 S.Ct. 1148 (2010). This duty to accept a complaint's allegations as true is tempered by the principle that "mere 'labels and conclusions,' and 'a formulaic recitation of the elements of a cause of action' will not suffice; a plaintiff must offer specific factual allegations to support each claim." *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). As recently clarified by the Supreme Court, the standard under 12(b)(6) is that to withstand a motion to dismiss, "'a complaint must contain enough allegations of fact, taken as true, to state a claim to relief that is plausible on its face.'" *Al–Owhali v. Holder*, 687 F.3d 1236, 1239 (10th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Thus, "a plaintiff must offer sufficient factual allegations to 'raise a right to relief above the speculative level.'" *Kansas Penn Gaming*, 656 F.3d at 1214 (quoting *Twombly*, 550 U.S. at 555). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer

possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678

(quoting *Twombly*, 550 U.S. at 556). It follows then that if the "complaint

pleads facts that are 'merely consistent with' a defendant's liability it 'stops

short of the line between possibility and plausibility of 'entitlement to relief.'"

*Id*. "'A claim has facial plausibility when the [pleaded] factual content . . .

allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged.'" *Rosenfield v. HSBC Bank, USA*, 681 F.3d 1172,

1178 (10th Cir. 2012). "Thus, in ruling on a motion to dismiss, a court

should disregard all conclusory statements of law and consider whether the

remaining specific factual allegations, if assumed to be true, plausibly

suggest the defendant is liable." *Kansas Penn Gaming*, 656 F.3d at 1214.

**DEFENDANTS' MOTION TO DISMISS (DK. 18)**

<u>Standing</u>

While the complaint alleges that UniCredit brings this action as

an agent of BONY, the defendants contend the complaint fails to show how

BONY obtained the power to sue the original debtors on these notes. The

defendants deny that the Indenture or other documents give UniCredit the

authority to pursue this litigation. The defendants argue that UniCredit does

not have standing as a holder of the promissory note because it has failed to

allege a viable chain of title for the lack of an affixed allonge in compliance

with the Uniform Commercial Code and in strict compliance with the

Indenture. The defendants also argue lack of proof of consideration paid

14

between Brooke Securitization and Brooke Credit (BCC) for the transfer of

loans.[3]  The court has reviewed the defendants' arguments against standing

and concludes that the recent orders in *UniCredit Bank AG v. Jue-Thompson*,

2013 WL 6185750 (D. Kan. Nov. 26, 2013), and *UniCredit AG v. Deborah R.*

*Eastman*, 2013 WL 237810 (D. Kan. Jan. 22, 2013), persuasively find similar

complaints filed by the same plaintiffs' counsel did allege sufficient standing

for UniCredit under nearly identical circumstances. For these reasons, it is

sufficient to concur with Judge Melgren's findings and conclusions:

> The Loan Documents in this case identified Brooke Credit as
> initial payee, and therefore, the original holder.FN21 Brooke Credit
> then sold and transferred all of its rights in the Loan Documents to
> Brooke Securitization, delivering the original instrument and executing
> a complete assignment of all rights in the instrument pursuant to the
> Sale and Servicing Agreement. By virtue of this transfer, Brooke
> Securitization became a person entitled to enforce the Loan
> Documents without consideration of any allonge.FN22
> 
> FN21. Kan. Stat. Ann. § 84–1–201(b)(21)(A).
> FN22. See Kan. Stat. Ann. § 84–3–203(b).
> 
> Further, under the Indenture, Brooke Securitization granted
> BONY all of its rights to enforce loan obligations in the Asset Pool,
> including Defendants' Loan Documents. The Uniform Commercial Code
> applies to securitization transactions involving promissory notes, and
> an indenture trustee like BONY constitutes a "secured party" under
> Article 9.FN23 By operation of the Power of Attorney, BONY granted
> UniCredit authority to exercise its rights to enforce the Loan
> Documents. Plaintiff's interest in Defendants' Loan Documents
> constitutes a "security interest" enforceable under Article 9.FN24
> 
> FN23. See Kan. Stat. Ann. § 84–9–102(72)(E) (defining "secured
> party" as, among other things, "a trustee, indenture trustee, agent,
> collateral agent, or other representative in whose favor a security
> interest or agricultural lien is created or provided for.").

---

[3] This argument is more than a facial attack. Because the defendants offer
only the barest of allegations, the court summarily rejects this factual
challenge at this juncture. The court also rejects this argument for the same
reasons expressed in *Eastman*, 2013 WL 237810 at *7.

FN24. See Kan. Stat. Ann. § 84–1–201(b)(35).

The Court finds that Brooke Securitization obtained the rights of a holder, namely Brooke Credit, through the transfer effected by the Sale and Servicing Agreement. Similarly, the Court must find that BONY obtained the rights of a holder, namely Brooke Credit and/or Brooke Securitization, by virtue of the transfer effected in the Indenture.

By operation of the Power of Attorney, BONY authorized UniCredit to enforce all of its rights pertaining to the Loan Documents. For this reason, the Court finds that these transfers render Plaintiff UniCredit, at minimum, a "person entitled to enforce" the Loan Documents as a "nonholder in possession of the instrument who has the rights of a holder." FN25 Because Plaintiff has standing as a nonholder, the Court does not reach whether Plaintiff constitutes a holder or a holder in due course under the disputed allonge. The parties may therefore proceed to engage in discovery concerning Plaintiff's status as a holder and other matters relevant to UniCredit's enforcement of the Loan Documents. Defendants' motion to dismiss for lack of standing must be denied.FN26

FN25. Kan. Stat. Ann. § 84–3–301.

FN26. *See UniCredit Bank AG, New York Branch v. Deborah R. Eastman, Inc.*, 2013 WL 237810, at *6–8 (D. Kan. Jan. 22, 2013).

*UniCredit Bank AG v. Jue-Thompson*, 2013 WL 6185750 at *4-*5. In sum, UniCredit has alleged a sufficient basis for standing to avoid dismissal at this time.

<u>Quantum Meruit</u>

For its fourth cause of action, the plaintiff alleges that Brooke Credit provided monetary benefit and valuable services to the defendants who knew these were provided with the expectation of repayment and compensation. The defendants seek dismissal because UniCredit is not the entity who conferred the benefit which is one of the required elements for quantum meruit in Kansas. As before Judge Marten and Judge Melgren, UniCredit responds with the same argument and reliance on a Texas state

16

appellate court decision, *McElroy v. Unifund CCR Partners*, 2008 WL 4355276 (Tex. App. 14th Dist. 2008). *See Jue-Thompson*, 2013 WL 6185750 at *5; *Eastman,* 2013 WL 237810 at *7-*8. Following the lead of other federal district courts in Kansas, this court also declines to adopt the Texas court's interpretation of quantum meruit claims as no Kansas court has yet to adopt it. *Id*. The court grants the defendants' motion to dismiss this cause of action.

Breach of Implied Covenant Claim

The defendants seek dismissal arguing the plaintiff has not alleged a particular term of the contract that has been breached by reason of the defendants' failure to act with good faith. As part of its sixth cause of action, the plaintiff alleges at ¶ 136 that the, "Defendants breached their implied obligations of good faith and fair dealing under the RKC Loan Documents by, among other things, failing and refusing to turn over their commissions or Plaintiffs' Collateral." (Dk. 1). This allegation suffices to identify "the contractual provision relating to defendants' breach" of the implied covenant of good faith. *Jue-Thompson*, 2013 WL 6185750 at *6; *Eastman,* 2013 WL 237810 at *8. The court denies the motion to dismiss this claim.

Conversion

The defendants assert the two-year statute of limitations expired before this suit was filed on June 25, 2103, as the plaintiff knew in 2009 of

the default on the securitization notes. For its seventh cause of action, the plaintiff alleges the defendants converted the collateral by "failing to deliver possession of the Collateral upon such demand" made in June 2013. (Dk. 1). Until UniCredit made a demand upon the collateral following the notice of default and the defendants' failure to cure, "the conversion was not reasonably ascertainable by UniCredit." *Jue-Thompson*, 2013 WL 6185750 at *7; *Eastman,* 2013 WL 237810 at *9 (internal quotation marks and citation omitted). Thus, the conversion claim appears to have been brought within the two-year statute of limitations.  *Id.*

Illegality and Fraud

Citing U.C.C. 3-305(a)(1)(B) and (C), the defendants point to the findings and conclusions in the unconfirmed Arbitration Award as establishing their complete defenses of illegality and fraud. The defendants seek dismissal on these grounds based on two cursory paragraphs of argument in their initial motion and memorandum. In response, the plaintiff simply incorporates its memorandum filed in support of its motion to dismiss the defendants' amended counterclaims and to strike affirmative defenses. (Dk. 25, p. 20). The plaintiff summarily states that the defendants' motion to dismiss on this ground should be rejected as based on "an unconfirmed, defaulted Arbitration Award, obtained *in absentia* against non-defending insolvent business entities" and the plaintiff was not a party to the Arbitration. *Id.* In reply, the defendants expand on their argument by

18

several pages. The defendants stake their defenses on the proposition that the UniCredit/BONY as assignees stand in the shoes of the original lender and first assignor, BCC/Aleritas, and can obtain no better and no greater interest than the assignor. The defendants' reply, however, fails to deal with the central question of what application should the Arbitration Award have in this proceeding. The court will take up those issues in deciding the plaintiff's motion to dismiss and herein denies the defendants' motion to dismiss on this ground.

**PLAINTIFF'S MOTION TO DISMISS AMENDED COUNTERCLAIMS AND TO STRIKE AFFIRMATIVE DEFENSES OF DEFENDANTS (DK. 26) AND MOTION TO DISMISS SECOND AMENDED COUNTERCLAIMS AND TO STRIKE AFFIRMATIVE DEFENSES OF DEFENDANTS (DK. 47) AND BONY'S MOTION TO DISMISS COUNTERCLAIM (Dk. 45).**

The defendants/counterclaim plaintiffs (RKC and Cunninghams hereinafter collectively referred to as "defendants") have filed a second amended answer and counterclaims. (Dk. 34).They assert counterclaims for declaratory judgment that "UniCredit and BONY are jointly and severally liable for the causes of action and damages contained in the Arbitration Award" or, that "[a]lternatively, the Arbitration Award represents a contractual debt that" defendants may collect from UniCredit and BONY. (Dk. 34, p.44-45). As part of their counterclaims, the defendants group their allegations under the following liability theories:  agency, partnership, joint venture, successor liability, and alter ego. "Defendants also allege that the doctrines of *res* judicata and collateral estoppel preclude" BONY and

19

UniCredit "from re-litigating the findings of the Arbitration Award." (Dk. 52, p. 11).

BONY seeks to dismiss the counterclaim (Dk. 46) while UniCredit seeks not only to dismiss the counterclaim but also to strike the affirmative defenses. (Dk. 26 and 47). UniCredit argues for applying the heightened pleading standards of Fed. R. Civ. P. 9(b) and (c) against the counterclaim and affirmative defenses because of the underlying fraud claims or failure of conditions precedent included in the Arbitration Award and because of the affirmative defenses alleged as fraud, fraudulent inducement, accord and satisfaction, and prior material breach. Defendants' position is that their declaratory judgment counterclaims are not subject to the heightened pleading standards, and, if they were, then they would still meet the basic requirements and purposes of Rule 9(b) and (c).

### Rule 12(f) Standards

A motion to strike an affirmative defense under Rule 12(f) asks a court to "strike from a pleading an insufficient defense." The party responding to a claim for relief "must state in short and plain terms its defenses to each claim asserted against it." Fed. R. Civ. P. 8(b)(1)(A).  The Supreme Court in *Twombly* and *Iqbal* "limited its reasoning to complaints and made no mention of the standards for answers." *RES-MO Springfield, LLC v. Tuscany Properties, L.L.C.*, 2013 WL 3991794 at *3 (D. Kan. Aug. 5, 2013) (citations omitted). "[T]he plain language of Rule 8 appears to make

20

sections (b) and (c) markedly less demanding than that of Rule 8(a)." *Id.*

(internal quotation marks and citations omitted).

A motion to strike is "generally disfavored and considered a

drastic remedy." *UniCredt Bank AG v. Bucheli*, 2011 WL 4036466 at *5 (D.

Kan. 2011). Consequently, the Rule 12(f) standards are as follow:

> Within the meaning of Rule 12(f), a defense is insufficient if it cannot
> succeed, as a matter of law, under any circumstances.  To warrant
> striking a defense, its insufficiency must be clearly apparent and no
> factual issues exist that should be determined in a hearing on the
> merits. Furthermore, absent prejudice to an opposing party, courts
> should not strike a defense. Striking a defense should further the
> purpose of Rule 12(f) to minimize delay, prejudice and confusion by
> narrowing the issues for discovery and trial. The party seeking to
> strike a pleading or part thereof has a demanding burden to show
> adequate grounds under Rule 12(f).

*Layne Christensen Co. v. Bro-Tech Corp.*, 2011 WL 3847076 at *6 (D. Kan.

Aug. 29, 2011) (internal quotation marks, footnotes and citations omitted);

*see also Boardwalk Apartments, L.C. v. State Auto Property and Cas. Ins.

Co.*, 2013 WL 4504351 at *1 (D. Kan. Aug. 23, 2013). If the affirmative

defense fails the applicable Rule 9(b) standards, then the court may strike it

but allow the offending party the chance to amend and conform to Rule 9(b)

requirements, particularly during the early stages of litigation. *See Bowers v.

Mortg. Elec. Registration Sys.*, 2011 WL 2149423, at *4 (D. Kan. Jun. 1,

2011).

<u>Rules 9(b) and 9(c) Standards</u>

Rule 9(b) states that "[i]n alleging fraud or mistake, a party

must state with particularity the circumstances constituting fraud or mistake.

Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). The complaint must "set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof." *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1252 (10th Cir.1997) (internal quotation marks and citation omitted). "At a minimum, Rule 9(b) requires that a plaintiff set forth the who, what , when and how of the alleged fraud." *U.S. ex rel. Sikkenga v. Regence Bluecross*, 472 F.3d 702, 726–27 (10th Cir. 2006). Rule 9(c) requires that "when denying that a condition has occurred or been performed, a party must do with particularity." "This special pleading requirement has been applied to conditions precedent in common law contracts claims." *Anderson v. United Telephone Co. of Kansas*, 933 F. 2d 1500, 1505 (10th Cir. 1991) (citations omitted).

UniCredit first contends that the defendants' counterclaim and several affirmative defenses are based upon fraud and subject to Rule 9(b) requirements. The court summarily rejects this argument as the defendants concede they are not alleging that UniCredit "committed fraud." (Dk. 32). Rather, the defendants seek to use, offensively and defensively, the arbitrator's decision and award against UniCredit and BONY, and it is that decision which has already found that Brooke Entities had defrauded the defendants. Thus, the defendants are bringing declaratory judgment counterclaims against UniCredit and BONY seeking that they be found

vicariously or contractually liable for the Arbitration Award. Likewise, the defendants appear to be asserting affirmative defenses based on connecting UniCredit and BONY to the Arbitration Award and not on allegations of now proving independent fraudulent conduct or independent conditions precedent. If the defendants were intending to allege defenses based on UniCredit and BONY actually and individually participating in the fraudulent conduct or in failing to perform conditions precedent and to defend on the basis of that proof regardless of the Arbitration Award, then the court would find that the defendants plainly have not alleged such defenses with sufficient particularity.

UniCredit and BONY take issue with the defendants' use of "Brooke Entities" in the counterclaims without defining or listing what entities come under this title. From the attached Arbitration Award and the defendants' pleadings here, the movants find eight such "Brooke entities," but the allegations offer an arguable connection only between the defendants and two entities:  Brooke Securitization and BCC. The court will address the alleged connections and relationships in discussing the defendants' different theories of alleged liability. The court agrees with movants that it is not enough for the defendants to make conclusory allegations about status or general relationships under the Indenture without specifying what terms or provisions specifically support such conclusions. Nor can defendants rest claims on the mere incidence of common stock

ownership as somehow proving another relationship different in kind. These points will be addressed further below.

Agency

The defendants allege the Sales and Servicing Agreement obligated Textron to act as Brooke Securitization's agent and gave Textron "full power and authority, acting alone, to do any and all things in connection with such managing, servicing, administration and collection that it may deem necessary or desirable." (Dk. 34, ¶¶ 20-21). The defendants also allege that the Agreement "authorized Textron to participate in its own name in any legal proceeding relating to or involving RKC's loan" and that "Textron subsequently conveyed its rights, duties, and powers as servicer back to Aleritas pursuant to a Subservicing Agreement." *Id.* at ¶¶ 22-23. Under the heading of "Agency", at ¶ 54 of their counterclaims, the defendants allege first an express agency theory, "[u]pon information and belief, Brooke Securitization V, BONY, and the 2005-2 noteholders, including UniCredit, delegated authority to Aleritas [BCC], through Textron, by way of the Sale and Servicing Agreement to participate in the Tarrant County lawsuit and related arbitration on their behalf." They also allege an apparent agency theory at ¶ 56, "Brooke Securitization V, BONY and the 2005-2 noteholders, including UniCredit, intentionally or by want of ordinary care induced Counterclaim Plaintiffs to believe that Aleritas had the authority to act with regard to the Loan by using Aleritas as both the original lender and the

24

actual servicer of the loan." *Id.* The defendants wrap up their agency section with a theory of agency by ratification, that BONY and UniCredit "ratified Aleritas's participation in the arbitration" and "learned about the arbitration award by November 2008—at the latest—and did not enforce the loan documents or otherwise repudiate the Arbitration Award until several years later." *Id.* at ¶ 57.  As pled and argued, these agency allegations look at only whether Aleritas or BCC was authorized to act on behalf of or bind Brooke Securitization, BONY and/or UniCredit in the arbitration proceedings.

Quoting the relevant terms of the two agreements cited by the defendants, the movants lay out how these terms do not support an express agency by which Aleritas or BCC could bind Brooke Securitization, UniCredit or BONY in the arbitration proceeding. The Sales and Servicing Agreement attached to the plaintiff's complaint authorized Textron "to commence or participate in any other legal proceeding (including a bankruptcy proceeding) relating to or involving a Loan, an Obligor or the collateral, if any, securing the Loan." (Dk. 1-1, p. 29, § 3.1). As the movants point out, neither Brooke Securitization nor Textron were named parties in the arbitration proceeding. The defendants rely on the Subservicing Agreement to allege that Textron's agency authority was then transferred to BCC or Aleritas. The movants attach a copy of the Subservicing Agreement to their motions. (Dks. 27-4 and 46-4). From that agreement, the movants show that Textron delegated the authority to "[c]ommence enforcement proceedings against Obligors

and/or the collateral securing the Loans." (Dk. 27-4, p. 9). But in contrast to the Sales and Servicing Agreement, the Subservicing Agreement did not include a term which authorized BCC to "participate" in any legal proceeding "relating to or involving a Loan, an Obligor or the collateral." The movants conclude that the defendants have failed to allege facts plausibly asserting that BCC or Aleritas had the authority to act as the agent of Brooke Securitization, BONY or UniCredit in the arbitration proceedings.

Under Kansas law, an express agency is where the principal delegates authority to the agent "'by words which expressly authorize the agent to do a delegable act.'" *Professional Lens Plan, Inc. v. Polaris Leasing Corp.*, 238 Kan. 384, 390, 710 P.2d 1297 (1985) (internal quotation marks and citation omitted). The counterclaim must offer sufficient factual allegations as to show a right of relief that is plausible and more than speculative. There must be enough facts as to make it plausible that BCC or another Brooke entity was an agent, express, apparent or ratified, with the authority to bind Brooke Securitization, and/or UniCredit and BONY. *See Vestring v. Halla*, 920 F. Supp. 2d 1189, 1192-1193 (D. Kan. 2013). While the Subservicing Agreement gave BCC the authority to sue to enforce or collect on the loans, the agreement did not confer the authority to be sued or to participate in any other legal proceeding relating to the loans or collateral. The defendants do not allege any terms of the Subservicing Agreement that expressly authorized BCC or Aleritas to act as the agent of

Brooke Securitization, BONY or UniCredit and participate in any legal proceeding, like this arbitration proceeding, relating to the original lender's loans. The Subservicing Agreement expressly limited BCC's services to those specifically set forth on an attached exhibit which did not include this general authority to participate in or defend lawsuits. The defendants' filings lack a cogent response to the plain lack of a contractual term expressly delegating authority to BCC or Aleritas. With this argument being uncontested and with the relevant terms of the agreements before the court, the motion to dismiss this express agency claim is granted.

   "An ostensible or apparent agency may exist if a principal has intentionally or by want of ordinary care induced and permitted third persons to believe a person is his or her agent even though no authority, either express or implied, has been actually conferred upon the agent." *Professional Lens Plan, Inc.*, 238 Kan. at 391 (internal quotation marks and citation omitted). "[A]n apparent agent is one who, with or without authority, reasonably appears to third persons to be authorized to act as the agent of another. . . . [T]he apparent authority of an agent to bind the principal rests upon words or conduct of the principal which leads the third party dealing with the agent to reasonably believe the agent's authority is sufficient to cover the transaction in question." *Mulholland v. Metropolitan Life Ins. Co.*, 546 F. Supp. 2d 1231, 1235 (D. Kan. 2008) (quoting *Bucher & Willis Consulting Engineers, Planners and Architects v. Smith*, 7 Kan.App.2d

467, 469, 643 P.2d 1156 (1982)). "In determining whether an apparent agency existed, the court will look to the intentional acts or words of the principal to a third party and if those acts or words reasonably induced the third party to believe that an agency relationship existed." *Town Center Shopping Center, LLC v. Premier Mortg. Funding, Inc.*, 37 Kan. App. 2d 1, 6, 148 P.3d 565 (Kan. App. 2006) (citing *Mohr v. State Bank of Stanley*, 241 Kan. 42, 46, 734 P.2d 1071 (1987)).

In their counterclaim, the defendants allege at ¶ 56 that BONY, Brooke Securitization and the 2005-2 noteholders, including UniCredit, "intentionally or by want of ordinary care induced Counterclaim Plaintiffs to believe that Aleritas [BCC] had the authority to act with regard to the Loan by using Aleritas as both the original lender and the actual servicer of the loan." (Dk. 34). The defendants argue the transfer of their loan from BCC to Brooke Securitization was hidden from them by BCC who then eventually regained the authority to administer the loan. The defendants also assert the named Brooke defendants in the Texas case/arbitration proceeding represented themselves to be "the real parties in interest with respect to the Loan and that no other parties had an interest with respect to the Loan." (Dk. 34, ¶ 35). The movants point out that the alleged agent's representations do not establish an agent's apparent authority.

As this matter has been argued and presented to the court, the plain impression left is that the defendants have not alleged facts, that is,

28

words or conduct by the asserted principals, which led them to believe that

BCC, as the servicer of the loan, had the authority to be sued on behalf of

Brooke Securitization, BONY or UniCredit. What the defendants allegedly

relied upon were the words and conduct of the supposed agent or other

entities. The use of Aleritas/BCC to service the loan resulted from an

agreement between BCC and Textron, and there are no allegations of what

the counterclaim defendants said or did in this regard which would support

an apparent agency theory. The court grants the motion to dismiss the

apparent agency theory subject to the defendants' timely effort to provide

curing amendments.

Under the agency heading, the defendants also allege that

"Brooke Securitization V, BONY, and the 2005-2 noteholders, including

UniCredit, ratified Aleritas's participation in the arbitration. BONY and

UniCredit learned about the arbitration award by November 2008—at the

latest—and did not enforce the loan documents or otherwise repudiate the

Arbitration Award until several years later." (Dk. 34 ¶ 57). The defendants

rely on the law that a principal "acquiring knowledge of the unauthorized act

of an agent . . . should promptly repudiate the act, otherwise it will be

presumed that he has ratified and affirmed the act." *Theis v. DuPont, Glore

Forgan Inc.*, 212 Kan. 301, 304, 510 P.2d 1212 (1973) (citation omitted).

BONY and UniCredit argue for dismissal in that the defendants

have failed to allege that the Brooke entities in the state arbitration matters

also professed, represented or assumed to have been acting as the agent of

BONY, UniCredit or Brooke Securitization. "Before an act or contract can be

the subject of ratification, the one who performed the act or entered into the

contract must have professed, represented or assumed to have been the

agent of the one alleged to have ratified the act or contract." *Kramer v.*

*Farmers Elevator Co.*, 193 Kan. 438, 442, 393 P.2d 998 (1964). The Kansas

Supreme Court in *Kramer* quoted from an agency treatise:

> Since the effect of ratification is to confirm the act as done, it is
> indispensable, in order to have an act of agency, that the act ratified
> must have been done by the assumed agent as agent and in behalf of
> a principal. If the act was done by him as principal and on his own
> account, or on account of some third person, it cannot thus be ratified.
> And not only must the assumed agent have *intended* to act as
> agent for the person ratifying, but, as declared by the house of lords
> after most elaborate consideration and according to the weight of
> authority in the United States, he must have *professed* to act for a
> principal, though it is not necessary that he should have disclosed who
> that principal was if he be capable of identification within the rule
> already laid down.

*Id.* (quoting 1 *Mechem on Agency*, 2d ed., § 386 and citing 3 Am.Jur.2d

*Agency*, p. 555, § 171; 2 C.J.S. *Agency*, p. 1079, § 41(b)). Absent from the

defendants' counterclaim is the allegation that BCC/Aleritas represented,

professed or assumed to have been the agent of Brooke Securitization,

BONY or UniCredit. Instead, the defendants alleged that the defending

parties in the Texas suit "represented that they were the real parties in

interest with respect to the Loan and that no other parties had an interest in

the Loan." Dk. 34, ¶ 35).  The court dismisses this theory of agency liability

subject to the defendants' amending to cure the pleading deficiencies.

30

<u>Partnership</u>

Under this counterclaim theory, the defendants allege "on information and belief" that several pools of franchisee loans were securitized, that BONY serves as trustee on several indenture notes secured by these loans, and that UniCredit is majority owner of indenture notes on multiple pools. (Dk. 34, ¶¶ 58-60). As to factual circumstances offered for the partnership theory, the defendants  alleged on "information and belief" that "Brooke Entities, BONY and the 2005-2 noteholders, including UniCredit, shared in the gross returns and in the losses associated with these securitized pools of loans," that "through their contractual and business relationships Brooke Securitization V, BONY, and the 2005-2 noteholders, including UniCredit, shared control over the management of the Loan" and "were partners with respect to RKC's loan." (Dk. 34, ¶¶ 62-64).

BONY and UniCredit challenge these allegations as stating no more than the relationships existing by reason of the Indenture and Indenture Notes and as offering no facts supporting elements to a partnership under Kansas law. The defendants respond that they have alleged sharing in profits and losses in that the premiums or the lack of them from customers of the franchisee/obligors were the source of profits and losses shared between the Brooke Entities and the noteholders under the securitization. As for the parties' intentions, the defendants argue it's enough that they have alleged the involvement of BONY and UniCredit in

multiple securitization pools from which one can infer a "sophisticated

commercial relationship" and an intent "to be partners rather than to enter

into a single arms-length transaction." (Dk. 32, p. 11). The defendants also

point to BONY's judicial filing to secure a master after it no longer approved

of the Brooke Entities' management. In reply, BONY and UniCredit note that

the contractual agreements and relationships cited by the defendants do not

create "a sharing of revenues." Moreover, the allegations are not plausible

on their face in showing such a sharing, an intent to be partners, or an

active participation in the management of any joint enterprise.

A working definition of partnership in Kansas is "[a] contract of

two or more competent persons, to place their money, effects, labor and

skill, or some or all of them, in lawful commerce or business and to divide

the profit and bear the loss, in certain proportions." *Beverly v. McCullick*,

211 Kan. 87, 97, 505 P.2d 624 (1973) (internal quotation marks and

citations omitted). For a more complete definition and test, there is the

following:

> Numbered among the often approved tests to which we have referred
> are the following: Intention of parties to the contract; sharing in profits
> and losses; charging of losses against accumulated profits; community
> of control over management and direction of the business; active
> participation in management of the affairs of the enterprise; joint
> control and exercise of ownership over all or part of the business
> assets; participation in division of the net earnings; sharing in
> payment of expenses of operation; fixing of salaries by joint
> agreement; investment in the business of undistributed profits for the
> purpose of building up a substantial cash reserve; division of
> undistributed profits in the event of liquidation contingent upon
> repayment to one of the parties of cash originally invested in capital.

*Id.* (quoting *Potts v. Lux,* 161 Kan. 217, 222, 166 P.2d 694 (1946). In sum,

a Kansas partnership fundamentally reflects an agreement to pool resources

for business reasons and then sharing the profits and losses from the

business venture, and there are other factors that may evidence such an

agreement.

Even if made upon "information and belief," the defendants'

allegations must rise above mere suspicions, implausibly sweeping

conclusions, and speculation. The defendants have failed in this regard. In

*Twombly*, the Supreme Court required "a complaint with enough factual

matter (taken as true) to suggest that an agreement was made. Asking for

plausible grounds to infer an agreement does not impose a probability

requirement at the pleading stage; it simply calls for enough fact to raise a

reasonable expectation that discovery will reveal evidence of illegal

agreement." 550 U.S. at 556 (footnote omitted). Alleging no more than the

Indenture and its related agreements, the defendants would have it be

enough that if the parties engage in multiple indentures then one could

suppose and allege that a partnership exists particularly when one of the

parties later sues the others alleging they had diverted revenues contrary to

the governing agreements and obtains a court-appointed special master

regarding only the others' operations. Not citing any particular terms of the

Indenture documents, the defendants would have this court transform this

particular kind of transaction into a partnership on no more than the

allegation that the transaction was repeated. The suspicion of a partnership from the mere fact of multiple indentures is not enough. The defendants' allegations of profit and loss sharing here are too strained and sweeping to be plausible. The federal court lawsuit and the appointment of a special master in that proceeding are hardly what the court would regard as facts showing joint management of assets pursuant to a partnership.  The court grants the motion to dismiss this theory subject obviously to curing amendments.

Joint Venture

"Upon information and belief," the defendants allege "Brooke Securitization V, BONY, and the 2005-2 noteholders, including UniCredit, associated with one another to carry out the single business enterprise of making, pooling, and securitizing loans to franchisees like RKC for profit" as evidenced by the Sale and Servicing Agreement. (Dk. 34, ¶¶ 65-66). Also "[u]pon information and belief," the defendants allege these entities "had joint ownership and/or control of" RKC's loan and "effectively shared in the expenses, profits and losses associated with the Loan." *Id.* at ¶¶ 67-68. As with the partnership theory, the movants seek dismissal arguing the defendants have alleged no more than the Indenture and Notes and the terms of those agreements do not plausibly support a theory of joint venture. The defendants respond with the same points made under the partnership theory.

34

Under Kansas law, a joint venture is defined as:

an association of persons with intent, by way of contract, express or implied, to engage in and carry out a single business venture for joint profit, for which purpose they combine their efforts, property, money, skill and knowledge, without creating a partnership or a corporation, pursuant to an agreement that there shall be a community of interest among them as to the purpose of the undertaking, and that each joint venturer shall stand in the relation of principal, as well as agent, as to each of the other co-venturers, with an equal right of control of the means employed to carry out the common purpose of the venture ....

*Goben v. Barry*, 234 Kan. 721, 725, 676 P.2d 90 (1984) (internal quotation marks and citations omitted). For the same reasons that the defendants failed to allege a plausible claim of partnership, their allegations of a joint venture fail the plausibility standard. The court grants the motion to dismiss this theory again conditioned upon the defendants timely submitting amendments to cure.

<u>Successor Liability</u>

The defendants allege that, "the 2005-2 noteholders, including UniCredit, purchased a security interest in all of the assets of Brooke Securitization V" and that this transaction "amounted to a consolidation or merger of the corporations because the 2005-2 noteholders, including UniCredit, took a security interest in the pool of loans, but Aleritas [BCC] continued to service them." (Dk. 34, ¶¶ 74-76). The defendants further allege that "BONY and the 2005-2 noteholders, including UniCredit, benefitted from the malfeasance of their predecessor, Aleritas, because

35

without that malfeasance RKC would not have taken the Loan in the first place." *Id.* at ¶ 77.

As with the prior theories, the movants challenge that the defendants have not alleged and cannot allege facts sufficient to meet critical elements. The secured transactions documented in the Indenture and Indenture Notes "do not remotely resemble an agreement by the Indenture Trustee or UniCredit to assume debts of any 'Brooke Entities,' or a merger agreement of the Indenture Trustee or UniCredit with any "Brooke Entities,' or that the Indenture Trustee or UniCredit are mere continuations of any 'Brooke Entities.'" (Dk. 27, p. 36). The movants observe that the defendants purport to allege a successor liability between them and Brooke Securitization who is not liable for the Arbitration Award. In response, the defendants summarily argue that the purchase of a security interest in assets amounts "to a consolidation or merger" and that Brooke Securitization "is merely a continuation of Aleritas" with BONY and UniCredit now "servicing the Loan." (Dk. 32, p. 14).

'The general rule of successor corporate liability in Kansas is stated as follows:

> Generally where one corporation sells or otherwise transfers all of its assets to another corporation, the latter is not liable for the debts and liabilities of the transferor, except: (1) where the purchaser expressly or impliedly agrees to assume such debts; (2) where the transaction amounts to a consolidation or merger of the corporation; (3) where the purchasing corporation is merely a continuation of the selling corporation; and (4) where the transaction is entered into fraudulently in order to escape liability for such debts.

36

*Comstock v. Great Lakes Distributing Co.*, 209 Kan. 306, 310, 496 P.2d

1308 (1972) (quoting 15 Fletcher Cyclopedia of the Law of Private

Corporations § 7122 (perm. ed.)). The defendants have not plausibly alleged

any facts showing a transaction that amounts to a consolidation or merger.

The defendants' allegations presume a merger or consolidation from nothing

more than the fact of an Indenture and Indenture notes. Considering such

allegations defy the legal terms and the distinct legal relationships

established in those documents, the court is at a loss to find how they could

be plausible. Nor can the court see the plausibility in alleging BONY and

UniCredit are a continuation of Aleritas, simply because they are now

exercising their legal rights to collect on the defaulted loans which secured

the Indenture notes. The defendants' allegations and arguments fail to state

a claim for successor liability. The court grants the motion to dismiss this

theory again conditioned upon the defendants timely submitting

amendments to cure.

<u>Alter Ego</u>

The defendants allege that "UniCredit, BONY, and the Brooke

Entities had a unity of interest in enforcing the loan documents against" the

defendants and that they "did not respect their separate corporate identities"

in that (1) Aleritas originated the loans and later serviced them; (2) 2005-2

noteholders are undisclosed except for UniCredit; (3) UniCredit is both a

majority noteholder and the agent for BONY who is the trustee for the

37

noteholders; and (4) the securitization process used here was repeated with "many other loans to franchisees." (Dk. 34, ¶¶ 91-92). The movants attack these allegations as "threadbare legal conclusions" which do not make a plausible claim "that the Brooke Entities are merely the alter ego of the Indenture Trustee and UniCredit." (Dk. 27, p. 36).

Established Kansas law recognizes that one corporation can be the alter ego of another corporation:

> The fiction of separate corporate identities of two corporations will not be extended to permit one of the corporations to evade its just obligations; to promote fraud, illegality, or injustice; or to defend crime. Under circumstances where the corporate entity is disregarded, the parent corporation may be held liable for the acts of the subsidiary. The mere fact, however, that a subsidiary corporation was organized for the avowed purpose of avoiding liability on the part of the holding company does not, of itself, constitute fraud justifying disregard of the corporate entity of the subsidiary. The courts will disregard the fiction of a separate legal entity when there is such domination of finances, policy, and practices that the controlled corporation has no separate mind, will, or existence of its own and is but a business conduit for its principal.

*Dean Operations, Inc. v. One Seventy Assocs.*, 257 Kan. 676, 681, 896 P.2d 1012 (1995); s*ee Ice Corp. v. Hamilton Sundstrand Inc.*, 444 F.Supp.2d 1165, 1169–70 (D. Kan. 2006) ("The ultimate test for imposing alter ego status is whether, from all of the facts and circumstances, it is apparent that the relationship between the parent and subsidiary is so intimate, the parent's control over the subsidiary is so dominating, and the business and assets of the two are so mingled that recognition of the subsidiary as a distinct entity would result in an injustice to third parties." (citation

omitted)). The following ten factors guide a factfinder's evaluation of

whether separate entities have a "unity of interest":

> (1) whether the parent [organization] owns all or a majority of the
> capital stock of the subsidiary; (2) whether the [organization] have
> common directors or officers; (3) whether the parent [organization]
> finances the subsidiary; (4) whether the parent [organization]
> subscribed to all of the capital stock of the subsidiary or otherwise
> caused its incorporation; (5) whether the subsidiary has grossly
> inadequate capital; (6) whether the parent [organization] pays the
> salaries or expenses or losses of the subsidiary; (7) whether the
> subsidiary has substantially no business except with the parent
> [organization] or no assets except those conveyed to it by the parent
> [organization]; (8) whether in the papers of the parent  [organization]
> and in the statements of its officers, the subsidiary is referred to as
> such or as a department or division; (9) whether the directors or
> executives of the subsidiary do not act independently in the interest of
> the subsidiary but take direction from the parent [organization]; and
> (10) whether the formal legal requirements of the subsidiary as a
> separate and independent  [organization] are not observed.

*Commerce Bank, N.A. v. Liebau-Woodall & Assocs., L.P.*, 28 Kan. App. 2d

674, 679-680 (2001) (internal quotation marks and citations omitted). "In

addition to concluding that some of the 10 factors for determining alter ego

status exist, it must be shown that allowing the legal fiction of separateness

of the corporate structures results in an injustice." *Dean Operations, Inc.*,

257 Kan. at 687.

The defendants purport to allege that the "Brooke Entities" are

the alter egos of BONY and UniCredit. The defendants' counterclaim fails to

allege facts that would make this theory plausible. The defendants allege

that BONY owned "some" stock of Brooke Corporation and that BONY

executives personally owned more Brooke Corporation stock. Owning "some"

stock is not a factor. The defendants next allege that UniCredit financed Brooke Securitization by purchasing the notes in its pool of loans and that Brooke Securitization's business was only with UniCredit and BONY. These are no than an inherent and normal elements of the securitization process, and the court fails to see how this transaction necessarily changes a SPE into the alter ego of the largest noteholder or the noteholders' trustee. That this securitization process is repeated between the parties may be a circumstance, but it does not move the possibility of dominion or control from speculative to plausible. The defendants allege no facts from which to plausibly infer that UniCredit, BONY, and the Brooke Entities "did not respect their separate corporate identities." (Dk. 34, ¶ 92). That separate entities perform multiple functions does not show a "lack of respect" particularly when each of those functions was the result of separate contractual arrangements. Unable to find a plausible alter ego claim, the court grants the motion to dismiss this theory but will allow the defendants timely opportunity to cure the pleading deficiencies.

<u>Res Judicata and Collateral Estoppel</u>

The defendants explain that they "have pled . . . the doctrines of res judicata and collateral estoppel [to] show that the Arbitration Award has already established the causes of action so that they do not need to be re-litigated here." (Dk. 32, p. 17). The defendants allege that the Arbitration Award is a "final judgment on the merits of" their relationship to the Brooke

40

entities, the Loan, and related agreements. (Dk. 34, ¶¶ 80-81). The
defendants further allege that UniCredit and BONY are "precluded from
litigating issues that were or could have been raised in the arbitration"
because they were in privity with Aleritas, Brooke Corp., Brooke Agency
Services Co., and Brooke Franchise Corp., all of whom were parties named
in the arbitration proceeding. *Id.* at ¶ 82-84. Under the title of collateral
estoppel, the defendants similarly allege that "all of the issues of fact and
law related to" the "validity of the Loan, the enforceability of the guarantees
. . ., and liability owed to the defendants" were decided and that BONY and
UniCredit "were related in fact and via contracts" to the Brooke Entities who
"had the same interest in the arbitration that UniCredit and BONY have in
this case." *Id.* at ¶¶ 85-88. The defendants allege the "same issues are
precluded from relitigation in this case." *Id.* at ¶ 90.

The operative elements to claim and issue preclusion in Kansas
are as follow:

> Kansas law provides that four conditions must be met in order that a
> prior adjudication becomes res judicata. Kansas law also sets forth
> three conditions before a party will be estopped from collaterally
> attacking a prior adjudication:
>> "An issue is res judicata when four conditions concur: (1)
>> identity in the thing sued for, (2) identity of the cause of action,
>> (3) identity of persons and parties to the action, and [4] identity
>> in the quality of persons for or against whom claim is made.
>> [Citation omitted.] The requirements of collateral estoppel are:
>> (1) a prior judgment on the merits which determined the rights
>> and liabilities of the parties on the issue based upon ultimate
>> facts as disclosed by the pleadings and judgment; (2) the parties
>> must be the same or in privity; and (3) the issue litigated must
>> have been determined and necessary to support the judgment.

[Citation omitted.]" *Regency Park v. City of Topeka*, 267 Kan. 465, 478, 981 P.2d 256 (1999).

*Waterview Resolution Corp. v. Allen*, 274 Kan. 1016, 1023, 58 P.3d 1284, 1290 (Kan. 2002). The movants challenge these preclusion claims and defenses on numerous grounds. The court will address only those prevailing grounds.[4]

### *Valid Arbitration Award*

"An arbitrator's power to resolve a dispute originates from an agreement to arbitrate between the parties. Without such an agreement to establish the parties' consent, the arbitrator has no jurisdiction." *Anderson v. Dillard's, Inc.*, 283 Kan. 432, 436, 153 P.3d 550 (2007) (citation omitted). "It is a cardinal rule that arbitration is a matter of contract, and parties are bound by arbitration awards only if they agreed to arbitrate a matter." *In re Kaplan*, 143 F.3d 807, 815 (3rd Cir. 1998); *see First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 942 (1995) ("a party who has not agreed to

---

[4] On the issue of privity, the defendants allege that "UniCredit and BONY were in privity with Aleritas, Brooke Corp., Brooke Agency Services Co., and Brooke Franchise Corp" who were parties to the arbitration. (Dk. 34, ¶¶ 83-84). The movants argue a lack of privity in that they obtained their rights to the subject Loan prior to the Texas case and Arbitration Award and that at the time of the Arbitration Award they had sued the Brooke entities and thus had adverse interests to them. The defendants respond that privity can exist by reason of a pre-existing substantial relationship and that their allegations can be defended on principles of fundamental fairness in a due process sense. Considering the equitable principles guiding privity determinations, the court would have allowed the defenses to go forward despite the privity issues because of the relaxed Rule 12(f) standards. The court cannot say the same with respect to the plain legal deficiencies with the Arbitration Award discussed above.

arbitrate will normally have a right to a court's decision about the merits of its dispute"). Movants argue the arbitrator lacked the power to enter an arbitration award here, because the Loan Agreement at ¶ 44 authorized arbitration only at the "option of Lender" and the Lender at the time of arbitration was Brook Securitization which did not elect to arbitrate this dispute and which was not a party to arbitration. The defendants respond that Aleritas was the lender when the Loan Agreement was executed and that UniCredit has not proven that Brooke Securitization had exclusive rights under ¶ 44 at the time of the arbitration or had opposed arbitration.

The allegations are uniform that RKC's loan was in the pool of loans sold to Brooke Securitization on December 1, 2005. (Dk. 1-1, p. 61). The defendants allege that Aleritas eventually sold the Loan to Brooke Securitization. (Dk. 34, ¶ 19). Paragraph eighteen of the Loan Agreement addresses the Lender's assignment:

> (a) Lender may assign or delegate all or any part of its rights, title, interest or obligations in and to this Agreement or under any Loan Document to one or more Persons without the consent of Borrower. Lender may also assign or delegate all or any part of its rights, interest or obligations to service the loan which is the subject of the Loan Documents to one or more Persons without the consent of Borrower. Any such assignment by Lender shall be without further recourse to Lender.

(Dk. 1-5, p. 8). The defendants did not file their state court petition in Texas until March 7, 2007, or after the transfer of RKC's loan to Brooke Securitization. For all the reasons discussed above, the defendants have not alleged a plausible claim that Brooke Securitization consented or opted for

43

arbitration pursuant to the terms of ¶ 44 of the Loan Agreement:  "At the option of Lender, any issue, claim, dispute or controversy that may arise out of, in connection with or relating to the Loan Documents or their breach, and which the parties are not able to resolve themselves, shall be settled by arbitration . . . ." (Dk. 1-5, p. 12). From the face of the Loan Agreement and the allegations of their counterclaims, the defendants have failed to allege facts establishing that a valid arbitration award "in connection with or relating to the Loan Documents or their breach" was entered by an arbitrator who acted within the jurisdiction conferred by the agreement.

### *Necessary and Indispensable Party*

The movants contend that Brooke Securitization as the owner of the Loan was a necessary and indispensable party to RKC's efforts to void the Loan in the state court and arbitration. There is no question but that Brooke Securitization's ownership of the loan would be adversely affected by a judgment in the arbitration proceeding interest, and so the arbitration proceeding could not make a "just adjudication, without joining that party in the action." *McGinty v. Hoosier*, 291 Kan. 224, 235, 239 P.3d 843 (2010). As found above, the defendants have failed to allege grounds showing Aleritas/BCC to have been authorized to participate on behalf of Brooke Securitization or the plaintiffs in the Texas/arbitration proceedings. The court appreciates that the Rule 12(f) standards are not as strict as those under Rule 12(b)(6). Yet, the defendants offer no plausible legal theory for how the

representations made by the other Brooke entities in those proceedings prevent the movants now from making this legal argument.

As movants argue, the allegations, on their face, show no more than the defendants simply sued the wrong entities in Texas and completed the arbitration process without the correct parties. Brooke Securitization and the movants were never joined as parties to the Arbitration Award. The court's rulings above have found that the defendants have not made a plausible claim for vicarious liability against the movants, UniCredit or BONY. In short, as apparent from the face of the pleadings, the defendants have not alleged that the Arbitration Award is a final judgment on the merits of the Loan between the actual owner of the Loan and the defendants.

*Conclusion*

In sum, the defendants have not alleged "a valid and final award by arbitration" entitled to the same "rules of res judicata . . . as a judgment of a court." *Restatement (Second) of Judgments* § 84 (1982). Nor have they alleged a plausible claim of vicarious liability against the movants for this award. The defendants do not provide the court with any sound arguments and authorities for giving any preclusive effect or other legal effect to the arbitration award in light of the above rulings.

<u>Declaratory Judgment: Statute of Limitations and Money Damages</u>

The defendants deny that the statute of limitations for fraud, breach of contract and Civil RICO are applicable here and also deny that

they are making a claim for monetary damages. Instead of relitigating these claims and defenses, the defendants say they are only seeking to have the Arbitration Award enforced by declaratory judgment. The above rulings foreclose the defendants from relying on the Arbitration Award as the legal and factual basis for their affirmative defenses and declaratory judgment relief.

<u>Opportunity to Seek Leave to Amend</u>

The defendants ask the court to grant them an opportunity to seek leave to file amended counterclaims and/or affirmative defenses pursuant to Fed. R. Civ. P. 15(a)(2). It is not for the court to imagine whether there are possible amendments or facts to be alleged in support of them that would cure the pleading deficiencies discussed above. *Toone v. Wells Fargo Bank, N.A.*, 716 F.3d 516, 524 (10th Cir. 2013). The defendants do not submit for the court's consideration either a proposed amendment or a discussion of possible curing amendments. *Id.* Mindful of the discretionary policy favoring an opportunity to amend and cure the pleading problems, *Rosenfield v. HSBC Bank, USA*, 681 F.3d 1172, 1189 (10th Cir. 2012), the court shall grant the movants' motions subject to its consideration of the defendants' motion for leave to amended counterclaims and/or affirmative defenses filed within 20 days of the filing date of this order. The court notes that to date the parties' pleadings reveal utmost regard for exhausting the full range of possible claims and defenses. Consequently, the court wants to

46

remind the parties of its right to consider whether "it appears that the plaintiff is using Rule 15 to make the complaint a moving target, to salvage a lost case by untimely suggestion of new theories of recovery, [or] to present theories seriatim in an effort to avoid dismissal. . . ." *Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1206 (10th Cir. 2006) (quotations, alterations, and citations omitted).

IT IS THEREFORE ORDERED that the defendants' motion to dismiss (Dk. 18) is granted in part and denied in part as set forth above;

IT IS FURTHER ORDERED that the plaintiff's motion to dismiss amended counterclaims and to strike affirmative defenses of defendants (Dk. 26), the plaintiff's motion to dismiss second amended counterclaims and to strike affirmative defenses of defendants (Dk. 47) and BONY's motion to dismiss counterclaim (Dk. 45) this case are granted on the grounds stated above and subject to the court's consideration of the defendants' motion for leave to amended counterclaims and/or affirmative defenses filed within 20 days of the filing date of this order.

Dated this 26th day of June, 2014, Topeka, Kansas.


s/Sam A. Crow
Sam A. Crow, U.S. District Senior Judge

47